UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEREK W., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, <br> ACTING COMMISSIONER OF <br> SOCIAL SECURITY,[1] <br><br> Defendant. | No. 19 CV 8397 <br><br> Magistrate Judge McShain |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Derek W. brings this action for judicial review of the Social Security Administration's (SSA) decision denying his application for benefits. For the following reasons, the Court grants plaintiff's motion for summary judgment [15],[2] denies the Acting Commissioner of Social Security's motion for summary judgment [18], and remands this case to the agency for further administrative proceedings.

**Procedural Background**

In August 2016, plaintiff filed a Title II application for a period disability and disability insurance benefits, alleging a disability onset date of February 16, 2016. *See* [9-1] 20. The claim was denied initially and on reconsideration. [*Id.*]. Plaintiff requested a hearing, which was held by an administrative law judge (ALJ) on May 23, 2018. [*Id.*] 35-66. In a decision dated October 5, 2018, the ALJ found that plaintiff was not disabled and denied his application. [*Id.*] 20-29. The Appeals Council denied review on October 18, 2019 [*id.*] 1-5, making the ALJ's decision the agency's final decision. 20 C.F.R. §§ 404.955 & 404.981. Plaintiff timely appealed to this Court [1],

---

[1] In accordance with Fed. R. Civ. P. 25(d), Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as the defendant in this case in place of the former Commissioner of Social Security, Andrew Saul.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except for citations to the administrative record [9-1], which refer to the page numbers in the bottom right corner of each page.

and the Court has subject-matter jurisdiction to review the Acting Commissioner's decision under 42 U.S.C. § 405(g).³

## Factual Background

Plaintiff, who was 44 years old on his alleged onset date and had worked as a tool and die maker, *see* [9-1] 67, sought disability benefits based primarily on his thoracolumbar scoliosis and kyphosis with spinal cord compressions and degenerative disc disease. [*Id.*] 23. Plaintiff stated in his SSA function report that these impairments caused chronic pain in his back and hips and prevented him from bending, lifting, twisting, and standing for any long period of time. [*Id.*] 214, 219.

### A. Plaintiff's Spinal Condition

When he was 12 years old, plaintiff was diagnosed with congenital scoliosis, "a lateral curvature of the spine which can cause backache and fatigue." *Van Buskirk v. Saul*, No. 18 C 8035, 2022 WL 475968, at *2 n.5 (N.D. Ill. Feb. 15, 2022). [9-1] 282. Plaintiff's condition was managed conservatively and without significant issues through his mid-twenties. *See* [*id.*] 305, 344. In more recent years, however, plaintiff developed posterior thoracolumbar back pain that progressed and "ultimately prevent[ed] him from exerting his job which is quite physical." [*Id.*] 344. Plaintiff also began to experience pain, tingling, and numbness in his left leg, "especially . . . when he is bending forward." [*Id.*] 305. Plaintiff's spinal deformity was "extremely severe" and involved "a very sick spinal cord." [*Id.*] 390. One of his treaters opined that, had plaintiff's spinal condition been left untreated, "the natural history" of the condition "involves almost 100% of eventual paralysis." [*Id.*].

In April 2016, plaintiff was examined at the Illinois Bone and Joint Institute by Dr. Steven Mardjetko. [9-1] 291-92. Plaintiff presented with pain and numbness in his back and legs as well as mild paraparesis. [*Id.*] 291. Dr. Mardjetko observed that plaintiff's condition involved both kyphosis, which "is a curving of the spine that causes a bowing or rounding of the back" that "leads to a hunchback or slouching posture," *Latoria v. Astrue*, No. 12 C 1097, 2013 WL 438120, at *2 n.2 (N.D. Ill. Feb. 5, 2013), and scoliosis. [9-1] 291. Based on his review of plaintiff's x-rays and an MRI, Dr. Mardjetko stated that "[t]he question is how much surgery we do on this gentleman." [*Id.*] 291-92. Mardjetko opined that a posterior stabilization without a posterior vertebral column reconstruction (PVCR) "would be a conservative approach and probably neurologically safer." [*Id.*] 292. But Dr. Mardjetko was "not sure" that this conservative approach "would adequately decompress the spinal cord" given that "some of this is deformity related and not just a compressive pathology noted." [*Id.*] 292. Rather, Dr. Mardjetko believed that a PVCR "would likely be required." [*Id.*]. This was a "fairly big operation that carrie[d] significant neurological risk[.]"

---

³ The parties consented to the exercise of jurisdiction in this case by a United States Magistrate Judge. [7].

[*Id.*]. Given the gravity of the situation, Dr. Mardjetko recommended that plaintiff solicit additional opinions. [*Id.*].

In July 2016, plaintiff was examined by Dr. Ricardo Fontes of Rush University Neurosurgery Chicago. [9-1] 344-48. Plaintiff reported, *inter alia*, pain radiating into the posterior legs that was worse when he flexed forward and instances of tripping due to left leg incoordination. [*Id.*] 344. Dr. Fontes observed that plaintiff had a normal gait, but was unable to heel-, toe-, or tandem-walk. [*Id.*] 345. Fontes concluded that plaintiff had refractory pain due to deformity but also clinically significant thoracic myelopathy due to spinal cord compression. [*Id.*] 347. According to Dr. Fontes, plaintiff's condition posed "a severe problem with potential for paralysis if allowed to progress" and "pose[d] significant risk for paralysis during corrective surgery." [*Id.*]. Nevertheless, Dr. Fontes recommended that plaintiff undergo T4-L4 fusion and PVCR surgery because these procedures could allow plaintiff to "maintain[ ] some additional motion[.]" [*Id.*].

In September 2016, Dr. Fontes performed what even the ALJ recognized was "an extensive surgical procedure" on plaintiff's spine. [9-1] 25, 390-91. The surgery, which lasted about twelve hours [*id.*] 52, entailed (1) posterior osteotomies at T7-8, T8-9, T9-10, T11-12, T12-L1, and L1-2;[4] (2) a multilevel kyphectomy; (3) placement of posterior segmental instrumentation at multiple levels of the spine; (4) application of an anti-kyphosis device; (5) an instrumented fusion of T4 through L4; and (6) a transpedicular decompression and partial vertebrectomy at T11-12. [*Id.*] 25, 390. Two transpedicular screws were inserted into plaintiff's back and stabilized by vertical rods. [*Id.*] 451. Dr. Fontes attempted a limited correction of plaintiff's scoliosis during the operation, but the poor condition of plaintiff's spinal cord led Fontes to abandon this part of the surgery. [*Id.*] 391.

Plaintiff was seen by Dr. Fontes for a follow-up appointment in November 2016, seven weeks after surgery. [9-1] 576-77. Plaintiff reported that his kyphotic deficit had completely resolved and "the pain associated with it was less[.]" [*Id.*] 576. He complained of occasional new pain in his mid-thoracic region and numbness in his feet, but "[o]verall" plaintiff reported feeling "much better" than he had felt before surgery. [*Id.*]. On examination, Dr. Fontes found that plaintiff's stance and gait were aided, plaintiff used a walker to guide his gait, and plaintiff's range of motion in the thoracic spine was restricted. [*Id.*]. Fontes concluded that plaintiff was "much improved when compared to before surgery," the "coordination issues are gone in his lower extremities," and the radiating pain and back pain were likewise gone. [*Id.*] 577. Dr. Fontes asked whether plaintiff wished to undergo a second-stage surgery that might have further reduced his pain, but plaintiff said he "definitely would not want another surgery." [*Id.*].

---

[4] An osteotomy is a surgical procedure that "cuts and reshapes bones." *Fromer v. Riggs*, No. 2:17-cv-66-JMS-DLP, 2019 WL 1416728, at *4 n.2 (S.D. Ind. Mar. 29, 2019).

Plaintiff returned to see Dr. Fontes in December 2016. [9-1] 579-80. Fontes noted that plaintiff was "doing very well for the severity of his preoperative problem" [*id.*] 580, but also "persist[ed] with balance problems and had a recent fall." [*Id.*] 579. On examination, plaintiff was "still off-balance," his range of motion was decreased, and, although he could walk without assistance, he could not toe-, heel-, or tandem-walk. [*Id.*]. Dr. Fontes advised plaintiff that it was possible to continue with a vertebral column reconstruction to correct his alignment, but plaintiff did not wish to pursue this option. [*Id.*]. Fontes opined that plaintiff was "off-balance, as before surgery, because of cord compression and myelomalacia and further surgery is not likely to help that." [*Id.*] 580. Regarding a possible return to work, Fontes opined that plaintiff was "unable to perform physical labor because of myelopathy and the long fusion" and unlikely to "regain that ability"; instead, Fontes advised plaintiff to "look into re-training in some other occupation." [*Id.*].

Plaintiff was evaluated by Dr. Fontes again in October 2017. [9-1] 652-54. Plaintiff complained of numbness in the incision area and in his left leg, but otherwise reported that he was doing "quite well" and his strength had improved compared to his pre-operation condition. [*Id.*] 652. He reported mild back pain but he was not taking medication for it. [*Id.*]. "Upon examination, [plaintiff] had limited motion in the lumbar and cervical spine." [9-1] 26. Plaintiff had a normal gait, and he could heel-, toe-, and tandem-walk without difficulty. [*Id.*] 653. Dr. Fontes found that plaintiff's preoperative myelopathy had completely resolved and that he presented good clinical alignment. [*Id.*] 654.

### B.   The Administrative Hearing

At the hearing before the ALJ, plaintiff described experiencing pain in his back and hips. [9-1] 42, 49. Plaintiff treated his pain with muscle relaxers and pain killers, the latter of which he used only occasionally, and by lying down, which took the pain off his lower back. [*Id.*] 42, 52. Asked by the ALJ how far he could walk while using his cane, plaintiff testified that he "got up from the building to here minus the elevator. I don't know how far that is. But that's about normal before I sit down." [*Id.*] 43. Plaintiff could sit up straight, but he was unable to lean back because of the rods in his back, which had been placed just below his shoulders and extended to just above his hips. [*Id.*] 50.

Plaintiff testified that he had difficulty bending because he was "screwed together":

> Q:   Okay. And you had mentioned that bending was quite difficult. Why is that?
> A:   I'm screwed together.
> Q:   Okay.
> A:   I –

4

| | |
|---|---|
| Q: | And you lose balance at times? |
| A: | Yes. I can't – I can only bend so far. |
| Q: | Oh, okay. How far can you bend without it becoming a problem with your balance? You're, you're kind of sitting at a 90 degree angle. Like, could you bend 45 degrees? I don't want you to have to do it there, but you can – |
| A: | Well it's better to show than to – if I support myself, I can go about that far. But right there is where I start feeling – right here. |
| Q: | Okay. So you're standing not upright. You're kind of, I don't know. |
| A: | Leaning. |
| Q: | Leaning a little bit – |
| A: | I can stand. |
| Q: | Maybe at a 45 degree angle. So you can't – you can't bend beyond the 45 degree? |
| A: | Not without pain. |
| Q: | Not without pain? So you can't – you couldn't bend down and pick off something off the floor? |
| A: | If somebody drops $50, I'm out $50, that's – unless I put my foot over it. |
| Q: | Oh, okay. So if you were sitting, you can't bend also and pick something off the floor or anything like that? |
| A: | No. I – my range of mobility side to side is this. That – that's about as far as I can – |
| Q: | How about stooping? Could you lean forward and kind of bend at the waist? |
| A: | That's what I was doing at the table. That's this. |
| Q: | Okay. But you can't – you can't lean forward all the way and bend at the waist off to – |
| A: | No. |
| Q: | – the ground or anything like that? |
| A: | No, ma'am. And I'm going to need my cane back. |

[*Id.*] 50-51.

Plaintiff also testified that he can stand on his feet for "[m]aybe a half hour," and that he could sit for about the same length of time before he would stand up to relieve the pain in his hips. [9-1] 43. However, plaintiff "usually lean[s] on something" or "touch[es] something" when he stands, and he probably could not "free-stand for a half an hour." [*Id.*] 54-55.

Vocational expert (VE) Kari Seaver testified at the hearing. [9-1] 61. The ALJ instructed the VE to assume an individual of plaintiff's age, education, and work experience who could (1) stand and/or walk a total of two hours during an eight-hour workday, (2) sit at least six hours during an eight-hour workday with a sit/stand

option where the individual could stand for one-to-two minutes after sitting for 30 minutes, and (3) occasionally stoop, crouch, kneel, crawl, bend, and twist. [*Id.*] 62. Asked whether there were any jobs that such an individual could perform, the VE testified that such an individual could work as a sorter, an assembler, and a packer. [*Id.*] 62-63. The VE added that such an individual could work in those jobs even if he needed a cane to get to and from the workstation, but no jobs would be available if the individual "needed a cane to stand at the workstation." [*Id.*] 63. The VE added that work as a sorter, assembler, and packer would be precluded if the individual "cannot stand without leaning on something for at least a half an hour[.]" [*Id.*] 66. Under questioning by plaintiff's attorney, the VE testified that such an individual could not perform the sorter, assembler, or packer positions if he could not bend at the waist. [9-1] 64. While none of the jobs required bending, the VE explained, some bending was inherent in the acts of sitting down at, and standing up from, the workstation. [*Id.*]. Finally, the VE testified that the individual hypothesized by the ALJ could not perform the sorter, assembler, or packer jobs if he were capable of "less than occasional bending." [*Id.*] 65.

## C.    The ALJ's Decision

At step one of her decision, the ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged onset date. [9-1] 22-23. At step two, the ALJ concluded that plaintiff's thoracolumbar scoliosis and kyphosis with spinal cord compression and degenerative joint disease were severe impairments. [*Id.*]. At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments the met or medically equaled the severity of a listed impairment. [*Id.*] 23-24. The ALJ then ruled that plaintiff had the residual functional capacity (RFC) to perform sedentary work, except that plaintiff (1) could never climb ropes, ladders, or scaffolds; (2) could occasionally climb ramps and stairs, balance, stoop, crouch, kneel, crawl, bend, or twist; (3) must be provided a sit/stand option allowing him to stand for one or two minutes after sitting for 30 minutes; and (4) must be allowed to use a cane as needed to get to and from the workstation. [9-1] 24. Turning to step four, the ALJ found that plaintiff could not perform his past relevant work as a tool and die maker and a pinsetter mechanic. [*Id.*] 27-28. At step five, the ALJ ruled that jobs existed in significant numbers in the national economy that plaintiff could perform–namely, the sorter, assembler, and packer jobs identified by the VE. [*Id.*] 28-29. The ALJ accordingly found that plaintiff was not disabled.

## Legal Standard

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

6

To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairments; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. *See* 20 C.F.R §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). But the standard "is not entirely uncritical. Where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brett D. v. Saul*, No. 19 C 8352, 2021 WL 2660753, at *1 (N.D. Ill. June 29, 2021) (internal quotation marks and citation omitted).

## Discussion

Plaintiff argues that the ALJ's decision should be reversed and remanded for three reasons. First, plaintiff argues that the ALJ's subjective symptom analysis was patently erroneous because (1) the objective findings in plaintiff's medical records were "far more dire" than the ALJ appreciated, (2) the ALJ gave undue weight to the fact that plaintiff's condition and pain improved after surgery without considering whether plaintiff had "improved enough to be capable of sustaining full time employment," (3) the ALJ's assumption that plaintiff would have sought further specialist treatment if his symptoms were as severe as he alleged ignored the significant risks of further surgery, and (4) there was no evidence to contradict plaintiff's allegations regarding his limited ability to balance and bend. [16] 8-13. Second, plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because (1) the ALJ failed to account for the limitations stemming from his non-severe shoulder impairment, (2) the medical evidence contradicts the ALJ's assessment of his ability to stand and bend, and (3) there is no evidence in the record to support the ALJ's determination that plaintiff was capable of occasional bending. [*Id.*] 13-15. Third, plaintiff argues that the ALJ improperly rejected the opinion of his treating neurosurgeon, Dr. Fontes, that plaintiff was incapable of physical labor. [*Id.*] 15.

The Court agrees that the ALJ's RFC determination is not supported by substantial evidence.[5] Although the ALJ found that plaintiff required a cane to get to and from the workstation, she made no finding respecting plaintiff's ability to stand without assistance. This was a critical error, not only because SSA regulations required the ALJ to make a finding respecting plaintiff's ability to stand and describe the evidence supporting that finding, but also because the VE testified that plaintiff would be unable to work if he could not stand unassisted for 30 minutes. Given plaintiff's testimony that he needed to lean on or touch something while standing, and the ALJ's failure to cite any medical evidence that was inconsistent with that testimony, there is no substantial evidentiary support for the ALJ's conclusion that plaintiff had the RFC to perform a job that required him to stand unassisted for at least 30 minutes.

"A disability claimant's RFC describes the maximum she can do in a work setting despite her mental and physical limitations." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014). "The relevant regulation, SSR 96-8p, lists seven strength functions that an ALJ must consider when assessing a claimant's RFC to work: lifting, carrying, sitting, standing, walking, pushing, and pulling." *Jarnutowski v. Kijakazi*, No. 21-2130, --- F.4th ----, 2022 WL 4126293, at *4 (7th Cir. Sept. 12, 2022). "The regulation also requires an ALJ to describe how the evidence supports each conclusion about a strength function, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." *Id.* (internal quotation marks and brackets omitted). The claimant's RFC is "based upon the medical evidence in the record and other evidence, such as testimony by the claimant or his friends and family." *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)); *see also Arnett v. Astrue,* 676 F.3d 586, 591 (7th Cir. 2012) ("An ALJ must evaluate all relevant evidence when determining an applicant's RFC[.]").

In ruling that plaintiff had the RFC to perform sedentary work, the ALJ found that plaintiff "must be provided a sit-stand option allowing him to stand for one or two minutes after sitting for 30 minutes" and "must be allowed to use a cane as needed to get to and from the workstation." [9-1] 24. However, the ALJ made no specific finding as to plaintiff's ability to stand with or without assistance, nor did she specifically discuss plaintiff's testimony and the medical evidence that bore on this issue. *See* [*id.*] 24-27.

The Court recognizes that "the lack of an explicit finding" regarding plaintiff's ability to stand "does not necessarily" require remand. *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020); *see also Jarnutowski*, --- F.4th ----, 2022 WL 4126293, at *4. In this case, however, the ALJ could not have concluded that plaintiff could work as a sorter, packer, or assembler without also finding that plaintiff could stand unassisted at a workstation and without leaning on something for 30 minutes. When the ALJ

---

[5] Consequently, the Court need not reach plaintiff's other grounds for remand.

asked the VE whether the individual in her hypothetical question could work in those positions if he "needed a cane to stand at the workstation," the VE responded that "[t]here would be no work for that individual." [9-1] 63. The VE also testified that "if one cannot stand without leaning on something for at least a half an hour," that person could not work as a sorter, packer, or assembler. [*Id.*] 66. Nevertheless, the ALJ made no finding respecting plaintiff's ability to stand unassisted. Nor did she address the apparently substantial evidence that plaintiff was unable to do so. For one thing, plaintiff testified that he could stand for "[m]aybe a half hour," but he "usually lean[ed] on something" or "touch[ed] something" when doing so; he doubted he could "free-stand for a half an hour." [*Id.*] 54-55. This testimony was consistent, moreover, with plaintiff's appearance at the hearing. During a lengthy exchange regarding plaintiff's ability to bend and stand, plaintiff's attorney observed, "[Y]ou're standing not upright. You're kind of, I don't know . . . Leaning a little bit." [*Id.*] 50. For another, Dr. Fontes observed in December 2016 that, despite the many successes associated with plaintiff's spinal surgery, plaintiff "[p]ersists with balance problems and had a recent fall," and he was "still off-balance" on examination. [*Id.*] 580. Dr. Fontes's treatment note even seems to imply that plaintiff's impaired balance was a permanent limitation: Fontes opined that "further surgery is not likely to help" resolve plaintiff's balance issues. [*Id.*].

Defendant contends that the ALJ adequately accommodated plaintiff's limitations by requiring that he have a sit/stand option, and that the ALJ's RFC determination incorporated even greater limitations than the state agency reviewing physicians had identified. [19] 10. While defendant has accurately described the ALJ's decision, these arguments do not respond to plaintiff's contention that the ALJ's RFC determination is fatally flawed because it did not account for his "documented inability to stand independently[.]" [16] 7; *see also* [*id.*] 14. The Court further observes that nothing in the ALJ's decision demonstrates how or why the ALJ concluded that a sit/stand option would adequately accommodate plaintiff's limitations, nor does the decision explain the ALJ's basis for concluding that plaintiff was capable of repeatedly sitting down and standing up throughout the workday. *See* [*id.*] 24-27.

In sum, the jobs that the ALJ found plaintiff could perform required the ability to stand unassisted at the workstation for up to 30 minutes, but the ALJ's RFC determination does not include a finding that plaintiff could do so. The ALJ's RFC determination is not supported by substantial evidence, and the case must be remanded.

Although the ALJ's mishandling of the standing issue alone warrants a remand, the Court observes that the ALJ's finding that plaintiff was capable of occasional bending appears equally problematic. Under SSA regulations, "occasionally" means "occurring from very little up to one-third of the time." SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). First, the degree to which plaintiff could

9

bend determined whether he could work as a sorter, packer, or assembler. While the VE testified that these positions did not require any bending beyond that inherent in the act of sitting down at, or getting up from, the workstation, *see* [9-1] 65, she also testified that "these jobs would be eliminated" if the claimant were capable of only "less than occasional bending." [*Id*.]. Second, plaintiff offered vivid testimony at the hearing that his ability to bend was significantly limited: he could bend "[m]aybe at a 45 degree angle," he could not bend down to pick something off the ground–not even from a seated position–and his "range of mobility side to side" was impaired. [*Id.*] 50-51. The ALJ's decision provides no insight into how she determined that plaintiff was capable of occasional bending: she did not cite any medical evidence contradicting this testimony, she did not rely on a doctor's functional report that was inconsistent with plaintiff's alleged bending limitations, and she did not cite anything in Dr. Fontes's treatment notes suggesting that plaintiff was capable of a certain amount of bending– let alone bending for up to one-third of a workday. *See Murphy v. Colvin*, 759 F.3d 811, 817-18 (7th Cir. 2014) (ALJ's finding that plaintiff could perform light work was not supported by substantial evidence where "[t]here is no medical evidence in the record to contradict Murphy's claim" that she could not perform such work, and primary doctor's treating notes neither "contradict[ed] Murphy's testimony" about her limitations nor "address[ed] the legal requirements one must be able to perform before the ALJ the can determine that the individual is able to do light work"); *see also Brett D.*, 2021 WL 2660753, at *1 (remand required where ALJ's decision is "so poorly articulated as to prevent meaningful review"). Accordingly, in determining plaintiff's RFC on remand, the ALJ should reexamine whether plaintiff is capable of occasional bending.

## Conclusion

Plaintiff's motion for summary judgment [15] is granted, and the Acting Commissioner's motion for summary judgment [18] is denied. The decision of the SSA is reversed, and, in accordance with the fourth sentence of 42 U.S.C. § 405(g), this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: September 19, 2022**